# IN THE UNTED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARCI D. WALKINGSTICK DIXON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-19-391-GLJ** |
| | ) | |
| **STATE OF OKLAHOMA, ex rel. Regional University System of the Oklahoma Board of Regents d/b/a/ Northeastern State University, and RICHARD REIF, in his individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter comes before the Court on motions for summary judgment by the Defendants in this case, the State of Oklahoma ex rel. the Regional University System of the Oklahoma Board of Regents d/b/a Northeastern State University ("NSU"), and Dr. Richard Reif, sued in his individual capacity. Plaintiff alleges claims of discrimination, retaliation, and harassment under Title VII and the Rehabilitation Act as to Defendant NSU, and a retaliation claim pursuant to the Family and Medical Leave Act ("FMLA") as to Defendant Reif. For the reasons set forth below, the Court finds that Defendant Northeastern State University's Motion for Summary Judgment and Brief in Support [Docket No. 114] should be GRANTED IN PART and DENIED IN PART, and Defendant

[Richard Reif's] Motion for Summary Judgment and Brief in Support [Docket No. 115] should be GRANTED.

## Procedural History

Plaintiff filed her original Complaint in this case on November 15, 2019, then filed an Amended Complaint on February 4, 2020 [Docket Nos. 2, 13].[1]  Plaintiff's Count I appears to allege claims of gender discrimination, race discrimination, retaliation, and hostile work environment as to NSU, in violation of Title VII; Count II asserts claims against NSU for discrimination and retaliation in violation of the Rehabilitation Act; and the remaining portion[2] of Count III is a claim against Dr. Reif for retaliation for use of FMLA leave.  Defendants filed their motions for summary judgment on January 30, 2023 [Docket Nos. 114, 115], and they are now ripe.  NSU alleges that Plaintiff's claims fail as a matter of law and that NSU had a legitimate, nondiscriminatory reason for firing her.

---

[1] Although Plaintiff's Amended Complaint specifically delineates only three counts, she actually alleges as many as seven or eight claims, taking them as a whole.  *See* Docket No. 13, pp. 7-9, ¶¶ 30-44.  "At minimum, [R]ule 8(a) requires a comprehensible, short and plain statement of the claim(s) sufficient to give the opposing party reasonable and fair notice of the basis of the complaint." *Abdelsamed v. Colorado*, 6 Fed. Appx. 771, 772 (10th Cir. 2001).  Although the Court proceeds on the substance, counsel is cautioned that, "as a structural matter, the Title VII Complaint is deficient because it purports to assert multiple claims for relief within each 'Claim for Relief.' . . . This format, which is repeated in Claims Three, Four, and Six, is improper under Rule 8 of the Federal Rules of Civil Procedure."  *Park v. TD Ameritrade Tr. Co.*, 2010 WL 4608225, at *2 (D. Colo. Nov. 5, 2010).

[2] Plaintiff's FMLA interference claim and all claims against previously-named Defendants Shelia Self and Briana Clifton-Drury were dismissed on December 3, 2020.  *See* Docket No. 53.  Despite the Court's clear order on this subject, Plaintiff urges "reconsideration" of this decision, asserting that additional (unidentified) facts now support such a claim.  Docket No. 120, p. 24.  The Court need not address these claims further as they were previously dismissed. *Oirya v. Brigham Young Univ.*, 2020 WL 1692640, at *2 (D. Utah Apr. 7, 2020) ("BYU had no need to address Mr. Oirya's immigration claim at the summary-judgment stage because that claim had already been dismissed.").

Defendant Reif alleges that he does not meet the definition of employer under the FMLA, Plaintiff cannot establish a prima facie case of retaliation, and NSU had a legitimate, nondiscriminatory reason for firing her.   Additionally, he asserts that he is entitled to qualified immunity.

## Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]"  Fed. R. Civ. P. 56(c).

## I.   Factual Background

Plaintiff is a Native American female.  Docket No. 114, p. 11, ¶ 8.  The undisputed facts reflect that Plaintiff worked in NSU's Information Technology Services ("ITS") Department beginning in September 2013, specifically in the Enterprise Systems unit of the ITS Department.  *Id.*, p. 10, ¶¶ 1-3.  Dr. Reif became her supervisor in 2015 when he was named Chief Information Officer ("CIO").  *Id.*, ¶¶ 4-5.  Dr. Reif and Plaintiff met

regularly, and Plaintiff (and her department) had weekly meetings with the ITS Infrastructure Department. *Id.*, ¶¶ 6-7. As part of Plaintiff's interactions with Dr. Reif, he once made two comments in the same conversation, using the terms "warpath" and "powwow," but he never made specific negative comments to her about being Native American. However, he asked about the origins of the "Walkingstick" name upon meeting her, which Plaintiff interpreted as Dr. Reif questioning her heritage. *Id.*, p. 11, ¶¶ 10-12; Docket No. 119, p. 7, ¶ 12. Additionally, Dr. Reif used the word "d**k" in one conversation. Docket No. 114, p.11, ¶ 14. Plaintiff never spoke to Dr. Reif about his use of any of those words, but did make a report in January 2018 to NSU's Title IX officer about his language and language used by others in the ITS Department. *Id.*, ¶¶ 13, 15, 17. After this report, the language in the department improved overall. *Id.*, p. 12, ¶ 18.

Dr. Reif once asked Plaintiff if he could use her meeting notes as minutes and, when she refused, he later invited an assistant to join the meetings to take minutes. *Id.*, ¶ 19. Plaintiff says she declined his request of her notes for minutes because he often assigned women to "gender-stereotypical jobs." Docket No. 119, p. 7, ¶¶ 19-20. Dr. Reif also asked a female IT employee to be in charge of throwing a party, but did not specifically ask Plaintiff to do so. The ITS department eventually created a sign-up sheet to help with party planning. *Id.*, ¶ 20.

On May 4, 2018, Dr. Reif emailed Plaintiff an official reprimand, noting that she had filled out a leave report but did not use vacation or personal days for two days when she had called in sick. The email reminded her that "exempt employees do not get comp time." Docket No. 114, p. 12, ¶¶ 23, 44 & Ex. 3, p. 1. Plaintiff cc'd human resources and

Title IX officers in an emailed response that same day in which she appealed the reprimand and made a formal complaint, including a request for an investigation into claims that Dr. Reif was hostile toward her, used racist and sexist language, and applied disparate versions of NSU policies and practices toward her.  *Id.*, Exs. 4, 6; Docket No. 119, p. 12, ¶ 44.  Dr. Sheila Self and Ms. Briana Clifton were appointed and conducted an investigation; however, Plaintiff characterizes the investigation as one used to find a reason to fire her for her next FMLA leave use rather than to investigate her complaints.  Docket No. 114, p. 13, ¶ 25; Docket No. 119, pp. 8-9, ¶¶ 25-29; Docket No. 120, pp. 7-8, ¶ 9-11.  Additionally, she contends that the poor performance claims against her, cited as support for her termination, were untrue.  Docket No. 120, p. 10-11 & 13, ¶¶ 22-26, 41-42.

As to her disability claim, Plaintiff did not notify NSU that she previously had a stroke in 2006, but she did notify Dr. Reif and NSU that she had a cardiac-related seizure disorder, and asserts that this information was included in her FMLA papers.  Plaintiff never requested a disability accommodation, but took FMLA leave for her illnesses, which she contends is an accommodation.  Docket No. 114, p. 12, ¶¶ 21-22; Docket No. 119, p. 7, ¶¶ 21-22.

NSU contends Plaintiff was fired for her attitude and job performance, including failure to implement critical software and failure to timely resolve ITS work tickets as well as being a micromanager who caused bottlenecks within the ITS department, and her failure to properly report time off.  Docket No. 114, pp. 13-14, ¶¶ 30-39.  Plaintiff believes that every yearly employment evaluation in the record was favorable in its entirety, and reflects she met expectations.  Docket No. 119, p. 12, ¶¶ 41-44.  Indeed, Dr. Reif indicated

in every section of Plaintiff's 2015 evaluation that she met expectations.  Docket No. 114, Ex. 14.  However, under "Planning, Organizing, and Time Management Skills," he stated, "Marci has done well in keeping the ship afloat during a short staffed season.  Now that her team is back to full strength, I am hopeful for a more proactive approach to meeting the campus needs."  *Id.*, p. 3.  Additionally, under "Previous Year's Goals," Dr. Reif wrote, "Although I marked 'Meets Expectations,' these items still need to be addressed.  I do not feel they could have been accomplished last year due to the unusual staffing difficulties encountered during this last year."  *Id.*, p. 5.

For her 2016 evaluation, Dr. Reif checked boxes indicating she met expectations in every applicable category.  *Id.*, Ex. 15.  Under "Innovation/Change/Initiative," he wrote, "Marci is very open to new ideas and processes as they pertain to other groups.  Marci needs to be open to new processes within her own group as we head towards increased campus transparency."  *Id.*, p. 2.  Under "Dependability/Reliability," he wrote, "Marci has had a challenging year with her health and attendance has been impacted.  As long as Marci continues to keep me informed, we can easily accommodate.  Please ensure that I am informed and that we keep our time as an example to others."  *Id.*, pp. 3-4.  Under "Planning, Organizing, and Time Management Skills," he states, "While I have marked this section as 'Meets Expectations,' this is the area that needs to improve.  The enterprise group gets a pass as they have been so short staffed but now that they are fully staffed and

we have added a half time project manager, I expect improvement in the area."[3]  *Id.*, p. 3.
Finally, under Interpersonal Skills/Teamwork, he writes, "Marked 'Meets Expectations,'
but do see that Marci is the 'Momma Bear' protecting her cubs and sometime struggles to
place the needs of the institution first.  This is an area that I will continue to monitor."  *Id.*,
p. 4.

Although NSU did not attach Plaintiff's 2017 evaluation, she included it as an
Exhibit to her response.  Again, all the boxes are checked indicating that the Plaintiff met
expectations in all applicable categories.    Docket No. 119, Ex. 5.    Under
"Attitude/Professionalism," Dr. Reif states, "Marci did produce a document for project
transparency.  We will need to work together as ITS leadership to ensure that we keep these
up to date."  *Id.*, p. 2.  In the next section, he notes that she "shows increased openness
towards campus transparency."  *Id.*  He further notes that they would continue to target
"Planning, Organization, and Time Management Skills" "as a team."  *Id.*, p. 3.  For
"Dependability/Reliability," he writes, "Marci has had another challenging year with her
health and attendance has been impacted.  As long as Marci continues to keep me informed,
we can easily accommodate.  Please ensure that I am informed and that we keep our time
as an example to others, 8:00 punctuality could be improved upon."  *Id.*, pp. 3-4.  He further
indicates that Marci communicates well and that he saw improvement with her trying to
understand the big picture needs of NSU.  *Id.*, p. 4.  Under the "Employee Work Plan," he

---

[3] Plaintiff denies this comment is in the 2016 evaluation, instead asserting that it is in her 2017
appraisal.    She further asserts without support that her 2017 appraisal was "favorable in its
entirety."  Docket No. 119, p. 12, ¶¶ 42-43; Docket No. 120, p. 10, ¶ 25.

included three goals.  The final goal states, "Keep working on a positive attitude toward new projects.  We can't be the department of NO.  Ongoing."  *Id.*, pp. 5-6.

As to Defendant Reif, additional undisputed facts reflect that Plaintiff took FMLA leave in 2016 (for herself), 2017 (for her mother), and in January 2018 (for her daughter), without adverse consequences.  She also took FMLA leave June 4-25, 2018 for her daughter, and again July 12-18, 2018 for herself.  Docket No. 115, p. 15, ¶¶ 31-36.  Dr. Reif contends the June 2018 and July 2018 FMLA leave periods were both taken without adverse consequences.  *Id.*  Plaintiff disagrees, asserting that Dr. Reif met with university officials to see how her FMLA protection could be removed, and that she was terminated on August 16, 2018, the day after her FMLA was retroactively approved.  Docket No. 120, pp. 11-12, ¶¶ 34-36.  Plaintiff's requests for FMLA leave were never denied, being approved each time.  Docket No. 115, p. 16, ¶¶ 38-39.

Christy Landsaw, Vice President of Administration and Finance at NSU wrote an August 22, 2018 letter to Plaintiff, stating that her employment was terminated effective August 16, 2018 "due to significant performance issues."  Docket No. 114, Ex. 19.  The letter continued, stating that her supervisor had previously discussed "performance related concerns including your negative attitude toward new projects, the poor reputation this attitude has given the entire IT department across campus, your failure to roll out projects in a timely manner, your division's backlog of tickets, and your failure to properly report time off."  *Id.*

## II.    Analysis

### A.  Count I – Title VII Claims

"Title VII prohibits employment discrimination based on 'race, color, religion, sex, or national origin.'" *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (*quoting Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).  To prove a case of either gender or race discrimination, "a plaintiff must provide either direct evidence of discrimination or prevail under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973)."  *Morman v. Campbell County Memorial Hospital*, 632 Fed. Appx. 927, 933 (10th Cir. 2015) (*citing Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012)).  Plaintiff does not appear to rely on any direct evidence, nor challenge Defendant's assertion that the *McDonnell Douglas* test applies.  The Tenth Circuit discussed the *McDonnell Douglas* test in *English v. Colorado Dept. of Corrections*, 248 F.3d 1002 (10th Cir. 2001):

> In order to survive summary judgment, a plaintiff relying on *McDonnell Douglas* bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action. Once the plaintiff has established a prima facie case, the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for taking an adverse employment action against the plaintiff. If the defendant successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason is pretextual, *e.g.*, that it is unworthy of belief.

248 F.3d at 1008 (*citing McDonnell Douglas*, 411 U.S. at 802).  *See also Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) ("To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must

present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas*[.]") (*citing Khalik*, 671 F.3d at 1192). The Court will thus apply *McDonnell Douglas* to Plaintiff's discrimination claims based on both gender and race, as well as her Title VII retaliation claim.

a. **Gender Discrimination**

Prima Facie Case.  "A prima facie case [of gender discrimination] generally requires a plaintiff to show, by a preponderance of the evidence, [i] that she is a member of a protected class, [ii] she suffered an adverse employment action, and [iii] the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 & n.1 (10th Cir. 2015) (These elements "are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor.") (quotation omitted) (*citing E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 800 (10th Cir. 2007)).  *See also Orr v. City Of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) ("To make out a prima facie case of discrimination, the female Plaintiffs must demonstrate (1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees.") (citation omitted).  This test is "not onerous." *Id.* at 1152.

Only the third factor appears to be at issue here.  As a woman, Plaintiff is a member of a protected class.  Additionally, although "[a]n adverse employment action is an indispensable prerequisite in a Title VII disparate treatment case that contains no direct evidence of intentional discrimination[,]" *Wilson v. Harvey*, 156 Fed. Appx. 55, 58 (10th

Cir. 2005), Plaintiff's termination clearly meets that requirement because the Supreme Court has said that an adverse employment action is one that "constitutes a significant change in employment status, such as hiring, *firing*, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added). The question, then, is whether the challenged action occurred under circumstances giving rise to an inference of discrimination.

Plaintiff, using an older four-part formulation[4] for a prima facie case, baldly asserts that she has made a prima facie case because her gender is a protected category, she was qualified for her job, she was involuntarily dismissed, and her job continued to exist after she was terminated. She expressly disavows any requirement that this prima face standard must in any way be related to gender discrimination. Having asserted that she has established a prima facie case, she provides no further discussion on her claim for gender discrimination. NSU, using the same older formulation, contends that there must be a connection between the prima face case and the alleged discrimination, and that Plaintiff cannot show evidence of significant or supported instances of gender-based discrimination. NSU further asserts that Dr. Reif's one-time use of the work "d**k," coupled with the

---

[4] "We note that the district court evaluated Ms. Tabor's prima facie case under an older, four-part test from the original *McDonnell Douglas.* We use a more recent variation of this test, a three-part test articulated by the Supreme Court in [*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)], which the Tenth Circuit expressly prefers." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013).

(undated) occasions Dr. Reif asked the Plaintiff to take notes during one meeting and asked her to plan a party, do not create the requisite inference.

Based on the facts in the record, Plaintiff does not put forth any evidence supporting an inference of discrimination related to her termination.  First, Plaintiff does not present any facts that these events occurred in close proximity to one another or to Plaintiff's termination.  From her own testimony, the party planning/cleanup requests happened when they "*used* to have dinners" such as a "chili cook off or a Thanksgiving dinner," and the note-taking request occurred "when we had *first started* to have our weekly directors' meeting."  Docket No. 114, Ex. 2, p. 183 (emphasis added).  Dr. Reif came on as Plaintiff's supervisor in 2015.  Taken together, these allegations are insufficient to give rise to an inference of gender-based discrimination for her termination.  *See Bennett*, 792 F.3d at 1267 ("Ms. Bennett points to no evidence in the record, either direct or circumstantial, supporting a claim of *animus*.").

Second, Plaintiff puts forth no evidence that she was treated differently than similarly situated employees, which is another way she could establish a prima facie case. *See Mitchell v. Kansas City Kansas Sch. Dist.*, 714 Fed. Appx. 884, 887 (10th Cir. 2017) (The district court "articulated the third element as requiring evidence that an employer treated similarly situated employees differently, which, as indicated above, is one way to show adverse action under circumstances creating an inference of discrimination[.]"). Either way it is assessed, Plaintiff fails to carry her burden of establishing a prima facie case of gender discrimination.

<u>Legitimate, Nondiscriminatory Reasons.</u>  Even if Plaintiff established a prima facie case of gender discrimination, NSU offers legitimate, nondiscriminatory reasons for her termination.  Ms. Landsaw detailed "significant performance issues," including Plaintiff's attitude toward new projects (reflected as a concern in her 2017 annual evaluation), the negative reputation of her entire department around campus, her failure to roll out new projects, her division's backlog of pending work tickets, and her failure to properly report time off.  Docket No. 114, Ex. 19.  This can be summed up in two categories:  poor job performance and improper timekeeping.

<u>Pretext.</u>  "In determining whether a plaintiff's evidence of pretext is sufficient to permit an inference of discrimination and thereby avoid summary judgment, the Supreme Court has noted relevant factors includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for summary judgment."  *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169 (10th Cir. 2007) (quotation omitted).  The Tenth Circuit has "upheld summary judgment for the employer based on the employer's own alternative, nondiscriminatory explanations, so long as they remain unrebutted and the employer's credibility has not been so damaged as to render such explanations suspect."  *Id*.  Plaintiff's burden here is not definitive proof, but one of establishing whether there is a "genuine factual dispute with regard to the truth."  *Id.* at 1170 (quotation omitted).  The Court addresses Plaintiff's evidence of pretext regarding the two above-mentioned categories in turn.  *See Bailey v. Am. Phoenix, Inc.*, 735 Fed. Appx. 524, 527-528 (10th Cir. 2018) ("Where, as here, an employer cites multiple

legitimate reasons for a termination, courts typically require the employee to raise a triable issue of pretext as to each reason unless the reasons are all intertwined or one reason is so clearly pretextual that it casts 'substantial doubt on' the others.") (*quoting Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000)).

Plaintiff contests that the timekeeping issue was serious, continually asserting that she did not misreport any leave and that, if she had, it was only a minor infraction. Furthermore, she believes she informed Dr. Reif of her plan to classify some of her time off as comp time and that he had not challenged her when she said she planned to do this. However, it is undisputed that Dr. Reif sincerely believed she had violated a policy (that she had recently enforced with another employee) and that he informed her the violation resulted in an official reprimand.  Docket No.114, Ex. 3.  More importantly, the evidence is undisputed that NSU (the Defendant for this claim) clearly believed she had committed this infraction and acted in good faith upon that belief by noting the timekeeping issue in her termination letter.  *Swackhammer*, 493 F.3d at 1170 ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.") (quotation omitted).

Plaintiff also asserts that "poor performance" issues were pretextual and repeatedly asserts that she had no performance issues prior to her May 4 complaint.  She contends that any complaints about her performance were undocumented and contrary to written evaluations of her performance.  However, her subjective opinion of her performance does not establish pretext.  *See Cummings v. United States Postal Serv.*, 2021 WL 4592271, at *5 (10th Cir. Oct. 6, 2021) (*citing Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220,

14

1231 (10th Cir. 2000) (the relevant pretext inquiry is how facts appeared to the decision maker, not the employee).  The unchallenged Annual Reports submitted by the parties reflect that, as far back as 2015, Dr. Reif made statements in Plaintiff's annual reviews that she needed to address previously-described goals and other issues.  While the parties disagree over the *meaning* of some portions of Plaintiff's annual reviews, the *plain language* of those reviews do not support Plaintiff's characterization of them as "wholly favorable" and "favorable in its entirety."  For example, although Dr. Reif noted in her 2015 evaluation that some problems were due to staffing issues, he indicated that he expected improvement after staffing issues were resolved.  In 2016, he specifically stated he expected improvement as part of the appraisal, *see* Docket No. 114, Ex. 15, p. 3 ("Comments to Planning, Organizing, and Time Management Skills"); Docket No. 115, Ex. 16, p. 3 (same).  Additionally, he stated that Plaintiff needed to be open to new processes, that she needed to improve in time management, and that she struggled to place the needs of the institution first.  In 2017, Dr. Reif noted increased openness to transparency, but that they needed to work on Planning, Organization, and Time Management as a team.  He also specifically noted her punctuality needed to improve.  Finally, her third goal under the Employee Work Plan admonished her to "Keep working on a positive attitude toward new projects.  We can't be the department of NO.  Ongoing."  Docket No. 114, Ex. 14, 15 & No. 119, Ex. 5.  These very reasons, dating years back, were repeated in Plaintiff's Termination Letter, Docket No. 114, Ex. 19.

In addition to asserting without support that the Annual Reports are "wholly favorable, Plaintiff attempts to challenge the text of the Annual Reports by disputing that

Dr. Reif did not tell her she needed to improve in the 2016 report, as asserted by Dr. Reif in his motion for summary judgment.  Docket No. 115, p. 14, ¶ 26 & Ex. 16, p. 3.  She declares that the "Planning, Organization, and Time Management" section was in the 2017 evaluation, which contains no comment about expecting improvement.  *See* Docket No. 120, pp. 10-11, ¶ 26 & Ex. 5, p. 3.  Plaintiff is factually incorrect on this point. *See Celotex*, 477 U.S. at 323-324 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.").  *See also Richardson v. Gallagher*, 2012 WL 4359116, at *8 n.15 (D. Colo. Sept. 24, 2012) ("[T]he Court reminds practitioners to reflect upon whether they dispute the **existence** of a fact—that is, whether something did or did not actually happen—or the **significance** of that fact—that is, what inferences should be drawn from the fact's existence.") (emphasis in original).  As noted above, Plaintiff's 2016 evaluation specifically states that the area of "Planning, Organizing, and Time Management Skills" "needs to improve."  Docket No. 115, Ex. 16, p. 3.  The facts demonstrate that NSU honestly believed this as well as the other reasons discussed above, even setting aside the statements NSU officials gathered regarding Plaintiff's performance and reputation (which she challenges) during their investigation.  Plaintiff thus fails to establish a genuine issue of material fact here.  *See Bennett*, 792 F.3d at 1267 (plaintiff can "establish pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in proffered reasons such "that a reasonable factfinder could rationally find them unworthy of credence[.]") (internal quotation marks omitted)).  *See also Bailey*, 735 Fed. Appx. at 528 ("Thus, to the extent

Bailey believes API's reasons are inconsistent with his own opinion of his work practices, he cannot create a triable issue of fact as to pretext.") (*citing Bennett*, 792 F.3d at 1268) ("We will not second-guess an employer's business judgment or replace its opinion of best practices with either an employee's opinion or our own.").

Accordingly, despite affording Plaintiff all necessary inferences, the Court finds that Plaintiff fails to make the requisite prima facie showing that she suffered an adverse employment practice actionable under Title VII, nor has she established pretext. NSU is therefore entitled to summary judgment on her claim for gender discrimination.

### b. **Race Discrimination**

Prima Facie Case. Similar to the analysis above, "[a] prima facie case [of race discrimination] generally requires a plaintiff to show, by a preponderance of the evidence, [i] that she is a member of a protected class, [ii] she suffered an adverse employment action, and [iii] the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett*, 792 F.3d at 1266 & n.1. *See also Orr*, 417 F.3d at 1149. And "[i]t is worth repeating that the prima facie stage in the *McDonnell Douglas* test is not onerous." *Id.* at 1152. Again, only the third factor appears to be at issue here. As a Native American, Plaintiff is a member of a protected class. And as stated above, Plaintiff's termination is clearly an adverse employment action. The question, then, is whether the challenged action occurred under circumstances giving rise to an inference of race discrimination.

Plaintiff's assertion of a prima facie case of race discrimination was done concurrent with her assertion of gender discrimination, using the older four-factor formulation for a

prima facie case.  The only difference is that for this claim she asserts her race is a protected category.  She expressly disavows any requirement that this prima face standard must in any way be related to her race discrimination claim.  Having asserted that she has established a prima facie case, she provides no further discussion.

NSU, also using the same four-factor formulation, again contends that there must be a connection between the prima face case and the alleged discrimination, and that Plaintiff cannot show evidence she was treated differently from similarly situated employees based on her status as a Native American.  The evidence in the record demonstrates that Dr. Reif asked Plaintiff about the origin of her last name when he met her in 2015 and that on at least one occasion he used the words "warpath" and "powwow."  Plaintiff also testified in her deposition that, after the unveiling of a statue on the NSU campus, Dr. Reif described the Chief of the Keetoowah Nation as "slow," "not very smart," and "not a good leader."  At that unveiling, a number of Tribal representatives and Native Americans had spoken.  Plaintiff herself testified that Dr. Reif did not make similar comments about any of the other speakers.  Docket No. 119, Ex. 18, pp. 9-11.

NSU points out that Plaintiff does not identify any similarly situated employee, but then conflates the prima facie case with other considerations by asserting that the similarly situated employee must be one who "consistently soured relationships across the NSU campus through obstinance and inaction, who had one-on-one meetings with Reif to improve performance, [and] who had Plaintiff's timekeeping violations."  Docket No. 114, p. 23.  Contrary to NSU's assertion, "[t]o be similarly-situated, the comparator employees must have had the same supervisor as the plaintiff and so were subjected to the same

18

performance and disciplinary standards as the plaintiff. Also, a similarly-situated employee is one who has violated employment rules of comparable seriousness to those violated by the plaintiff." *Mancell v. McHugh*, 111 F. Supp. 3d 1190, 1200 (D.N.M. 2015) (*citing Richardson v. Gallagher,* 553 Fed. Appx. 816, 824 (10th Cir. 2014) and *Green v. New Mexico,* 420 F.3d 1189, 1194 (10th Cir. 2005)). Plaintiff provides no evidence of a similarly situated individual who violated employment rules of comparable seriousness to those violated by Plaintiff. *See Mitchell*, 714 Fed. Appx. at 887 (The district court "articulated the third element as requiring evidence that an employer treated similarly situated employees differently, which, as indicated above, is one way to show adverse action under circumstances creating an inference of discrimination[.]").

Moreover, Plaintiff alleges insufficient facts to give rise to an inference of race-based discrimination leading to her termination. *See Bennett*, 792 F.3d at 1267 ("Ms. Bennett points to no evidence in the record, either direct or circumstantial, supporting a claim of *animus*.") (emphasis added). Accordingly, Plaintiff has failed to carry her burden of establishing a prima facie case of race discrimination.

Legitimate, Nondiscriminatory Reasons & Pretext. As above, even if Plaintiff *could* establish a prima facie case, Defendant proffers legitimate, nondiscriminatory reasons for her termination, namely, poor performance and improper timekeeping. With regard to pretext, Plaintiff makes the same assertions as discussed above.[5] But as discussed above,

---

[5] Indeed, both Plaintiff and NSU combine the arguments for the various claims, likely because so many of Plaintiff's claims require the application of the *McDonnell Douglas* burden-shifting analysis. Despite the parties' organization of the claims, the Court chooses to address each claim

the facts in the record demonstrate that NSU honestly believed Plaintiff had committed these infractions and acted on such belief. *Swackhammer*, 493 F.3d at 1170 ("The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.") (quotation omitted). Plaintiff's opinion of her own performance and NSU policies is insufficient to establish pretext. *Kendrick*, 220 F.3d at 1231 (the relevant pretext inquiry is how facts appeared to the decision maker, not the employee). Accordingly, despite affording Plaintiff all necessary inferences, the Court finds that Plaintiff fails to make the requisite prima facie showing that she suffered an adverse employment practice actionable under Title VII or that she established pretext. NSU is therefore entitled to summary judgment on her claim for race discrimination.

### c. Retaliation – Race and Gender

Plaintiff also asserts retaliation claim(s) under Title VII, alleging NSU terminated her employment in retaliation for making a complaint to NSU alleging sexual and racial harassment. "A claim of Title VII retaliation can []be proven either by direct evidence or by reliance on the *McDonnell Douglas* framework." *Bekkem*, 915 F.3d at 1267 (*citing Khalik*, 671 F.3d at 1192). Thus, "[u]nder the *McDonnell Douglas* framework, a plaintiff must first 'raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations.'" *Id.* (*quoting Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

---

and analysis separately for the purposes of clarity and logic as the application of the facts to the analysis varies by claim.

Prima Facie Case.  In general, "to establish a prima facie case of Title VII retaliation, Plaintiff must show '(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"  *Id.* (*quoting Khalik*, 671 F.3d at 1193).  The parties agree that the first two requirements of a prima facie case have been met.  Plaintiff's Title IX complaint consultation in January 2018 and her complaint of race and sexual harassment in May 2018 both qualify as protected activities.  *See Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1146 (D. Kan. 2011) ("Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII.") (*citing Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1381 (10th Cir. 1994)); *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 890 (10th Cir. 2018) ("To show she engaged in protected activity, Fassbender doesn't need to show that she reported an actual Title VII violation; rather, she must only show a reasonable good-faith belief that she was opposing discrimination.") (internal quotation omitted).  Further, her termination is certainly materially adverse.  *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) ("[H]e was fired, which obviously qualifies as 'materially adverse[.]'").

NSU contends that Plaintiff fails to establish a causal connection between the protected activity and her termination.  Plaintiff contends that the temporal proximity is sufficient to establish this requirement.  "Title VII retaliation claims must be proved according to traditional principles of but-for causation[.]"  *University of Texas*

*Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). "The evidence of but-for causation must be based on more than mere speculation, conjecture, or surmise." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quotation omitted). Although "[a] retaliatory motive may be inferred when an adverse action closely follows protected activity" and found sufficient for but-for causation, the termination must be "*very closely connected in time to the protected activity*" or "the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation[,] but that "a three-month period, standing alone, is insufficient to establish causation.") (emphasis in original).

NSU contends that Plaintiff made a complaint to its Title IX office in January 2018 and reported an official complaint to HR on May 4, 2018, and that she was fired August 16, 2018 – more than three months after her most recent complaint. NSU appointed officials who investigated her complaints, including by interviewing her on July 23, 2018, and Plaintiff says she repeated her "race and gender complaint and provided additional detail" at that time. Docket No. 119, p. 14, PF11. She contends this July 2018 interview was an additional complaint sufficient to qualify as protected activity and establish temporal proximity. Plaintiff herself acknowledges, however, that she merely "repeated" her earlier claims during this July 2018 meeting. Furthermore, this interview was part of the investigation that was a direct result of her May 4 complaint. Even construing evidence in the light most favorable to Plaintiff, the substance of Plaintiff's conversation during that

interview did not constitute a new complaint.   Accordingly, Plaintiff's most recent complaint was made on May 4, 2018, meaning that more than three months elapsed between her complaint and her termination.

A more-than-three-month gap, standing alone, is insufficient to establish causation for either of her complaints.  *Anderson*, 181 F.3d at 1179.  *See also Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-274 (2001) ("The cases that accept mere temporal proximity . . . must be very close.") (quotation omitted) (*citing, inter alia, Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient)).  "[W]here a gap of three months or longer has occurred, a plaintiff must present other evidence— 'more than mere speculation, conjecture, or surmise'—to establish that her protected activity was a but-for cause of the adverse employment action."  *Bekkem*, 915 F.3d at 1271 (*quoting Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (*quoting Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).  *See also Tafoya v. Dean Foods Co.*, 2009 WL 2762738, at *3 (D. Colo. Aug. 26, 2009) ("In the absence of close temporal proximity or other allegations suggesting a causal connection between her 2005 protected conduct and her 2007 termination, Ms. Tafoya fails to state a claim for retaliation[.]").  Accordingly, Plaintiff must set forth additional evidence to support her prima facie claim.

As additional evidence, Plaintiff refers generally to her purported statement of additional facts in support of pretext included in her summary judgment response brief, *see* Docket No. 119, p. 25 ("There is ample evidence of pretext which is set out in PF 18-24."), arguing this also meets the prima facie element requiring a causal connection.  The Court agrees that pretext evidence may be considered at the prima facie stage of retaliation claim.

23

*See Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) ("Although this kind of evidence is typically considered during the third phase of the *McDonnell Douglas* inquiry, Mr. Proctor correctly notes that we have considered evidence of pretext in the prima facie stage of a retaliation claim.").  However, Plaintiff provides no insight into how this litany of facts contributes to the analysis of but-for causation.  For example, in her additional statement of facts discussing pretext, Plaintiff first points to the timekeeping reprimand being pretextual.  Based on the record, it is undisputed that Plaintiff was reprimanded for the timekeeping issue the morning of May 4, 2018, but she made her complaint to HR in her emailed *response* to Dr. Reif's reprimand on that same day, by copying several NSU officials in her response.  The timekeeping reprimand, therefore, cannot be the basis of a causal connection in support of retaliation between her May 4 complaint and her termination because her reprimand preceded her complaint.

Plaintiff's remaining pretext facts appear to assert that NSU was looking for reasons to fire her, that her performance issues were undocumented, and that they were looking for ways to deny her FMLA leave.  She also contends at certain points that she never had a poor performance review prior to the filing of her May 4 Complaint, but, as discussed above, Dr. Reif noted several areas for improvement and ongoing goals during her annual reviews.  Even considering Plaintiff's additional assertions, she provides no evidence as to her Title VII retaliation claim that either of her complaints were the *"but-for"* cause of her termination.  *Proctor,* 502 F.3d at 1210-1211 ("The relevant question is whether Mr. Proctor can show that UPS's motive for taking adverse action was its desire to retaliate for the protected activity.") (quotation omitted).  Indeed, Plaintiff herself believed NSU was

looking to punish her for taking FMLA leave, not for making her complaints.  Docket No. 119, p. 9, ¶ 29.  Because Plaintiff fails to satisfy her burden of presentation of a prima facie case of retaliation under Title VII, NSU is entitled to summary judgment on this claim.  But even if Plaintiff could establish a prima facie case, she nevertheless fails to create a genuine issue of material fact as discussed below.

Legitimate, Nondiscriminatory Reason.  If Plaintiff establishes a prima facie case, the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for Plaintiff's discharge.  NSU proffers a reason for Plaintiff's discharge based on poor job performance in multiple areas of her work (including project implementation and working with others) as well as failure to properly report time off.  The Tenth Circuit has held that a party's burden to demonstrate a legitimate, nondiscriminatory reason is "exceedingly light."  *Bekkem*, 915 F.3d at 1268 (quotation omitted).  Here, Defendant easily meets this standard.

Pretext.  The burden then shifts back to Plaintiff to establish pretext.  "[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."  *Morgan*, 108 F.3d at 1323 (quotation omitted).  "[I]n evaluating pretext we do not 'look at each piece of evidence in isolation,' but rather consider all of the plaintiff's evidence 'in its totality[.]'"  *Bekkem*, 915 F.3d at 1270 (*quoting Orr*, 531 F.3d at 1215).  As discussed above, "[t]he relevant question is whether [Plaintiff] can show that [NSU's] motive for taking adverse action was its desire to retaliate *for the protected activity*."  *Proctor*, 502 F.3d at 1210-1211 (emphasis added).  The Court is not to determine whether the proffered reasons were "wise, fair or correct, but

whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Id.* at 1211 (quotation omitted). As discussed above, Plaintiff does not create a disputed issue as to whether NSU's proffered reasons are not worthy of belief. Accordingly, NSU is entitled to summary judgment on Plaintiff's Title VII retaliation claim.

### d. Hostile Work Environment – Race and Gender

"Title VII is not 'a general civility code' for the office; thus, 'the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.'" *Clayton v. Dreamstyle Remodeling of Colorado, LLC*, 2022 WL 910957, at *10 (D. Colo. Mar. 28, 2022) (*quoting Morris v. City of Colo. Springs*, 666 F.3d 654, 663-664 (10th Cir. 2012) (citations omitted)). This means that a hostile work "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). This is assessed under the totality of the circumstances, including:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The inquiry should also consider the "social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). In other words, "simple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (quotation omitted).

NSU approaches this claim as separate hostile work environment claims as to Plaintiff's race and gender.  Plaintiff does not make entirely clear whether her hostile work environment claim is based on race, gender, or the claims are aggregated, as neither her Amended Complaint nor her Response Brief address this question.  The Court will address the argument in the aggregate because Plaintiff's Amended Complaint appears to treat them as such by failing to distinguish them. *See Ford*, 45 F.4th at 1227 ("We have not addressed [whether aggregating race and sex-based hostility is mandated, but have previously] held that such aggregation is permissible.") (*citing Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987) ("The . . . question is whether, in determining the pervasiveness of the harassment against a plaintiff, a trial court may aggregate evidence of racial hostility with evidence of sexual hostility. We conclude that such aggregation is permissible.").

"To overcome summary judgment on this claim, the plaintiff must show (1) [s]he was discriminated against because of h[er] sex, and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of h[er] employment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).  *See also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) ("[T]o avoid summary judgment at the prima facie stage, a plaintiff must present evidence that creates a genuine dispute of material fact as to whether the workplace is permeated with discriminatory

27

intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment.") (quotation omitted).  And "conduct must be extreme to amount to a change in the terms and conditions of employment[.]" *Faragher*, 524 U.S. at 788 (1998).  The *McDonnell Douglas* analysis applies here, and Plaintiff must establish these four prima facie elements whether the claim is for race or gender discrimination:  "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [a protected category]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Lounds*, 812 F.3d at 1222 (quotation omitted). The parties appear in agreement that the only issue at this stage is the fourth element as to the severity and pervasiveness.

The test for severity and pervasiveness "'has both objective and subjective components. A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended,' and both must be proved." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (*quoting Morris*, 666 F.3d at 664). "This means the plaintiff must: (1) subjectively perceive the conduct to be severe or pervasive, and (2) show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Ford*, 45 F.4th at 1228 (quotation omitted). This is not, and "cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.  The Court is also mindful that "the severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for

28

summary judgment because it is quintessentially a question of fact." *Hernandez*, 684 F.3d at 958 (quotation omitted). Moreover, "derogatory comments need not be directed at or intended to be received by the victim to be evidence of a hostile work environment." *Id*. at 959. The focus here is not on the alleged offender's motivation or intent but on "whether a reasonable jury could find that the subjective and objective effect of their conduct was to pollute the environment with harassing conduct that was . . . offensive, or insulting." *Lounds*, 812 F.3d at 1228; *see also Sidlo v. Millercoors, LLC*, 718 Fed. Appx. 718, 728 (10th Cir. 2018) ("A plaintiff must prove both a subjective determination of hostility and that the environment was objectively hostile as viewed by a reasonable employee under the same or similar circumstances.") (quotation omitted).

NSU contends that Plaintiff's hostile work environment allegations amount to nothing more than a "short list of isolated comments" which are insufficient to establish a hostile work environment. In response, Plaintiff asserts it is not just Dr. Reif's use of the words "warpath," "powwow," and "d**k," but also instances of being refused communication, being given the silent treatment, and being denied equal access to resources in addition to excluding her from meetings. She also contends that Dr. Reif made derogatory comments about the Chief of the Keetoowah nation and asked questions about the origin of her name; made comments such as "You're in a good mood. Your husband must be out of town"; engaged in bullying and manipulation; was passive aggressive; and made gender-stereotypical remarks regarding dinner planning and note-taking during meetings. Docket No. 119, pp. 6-7, ¶¶ 8-12. She also says that hostilities and harassment increased after she reported Dr. Reif.

Noting the allegations made by Plaintiff and that the Court may consider derogatory comments directed at other individuals and nationalities, *see Unal v. Los Alamos Pub. Sch.*, 638 Fed. Appx. 729, 740 (10th Cir. 2016) (*quoting Tademy v. Union Pacific Corp.*, 614 F.3d, 1132, 1146 (10th Cir. 2008) ("We also note that evidence of a general work atmosphere, including evidence of harassment of other [racial minorities], may be considered in evaluating a claim, as long as Mr. Tademy presents evidence that he knew about the offending behavior.") (quotation omitted), the Court finds that Plaintiff meets her burden of establishing a genuine issue of material fact regarding sufficient severity or pervasiveness of a hostile work environment at NSU to defeat summary judgment, *i.e.*, a rational jury could find that NSU was permeated with discriminatory conduct that was sufficiently pervasive to alter the terms and conditions of her employment.  *Lounds*, 812 F.3d at 1232 (noting the fourth element is the "severity-*or*-pervasiveness component.") (emphasis in original); *see also King v. Sw. Aviation Specialties, LLC*, 2017 WL 1826695, at *5 (N.D. Okla. May 5, 2017) ("[P]ervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim.").  Although the evidence is by no means clear on this issue, the Court is not permitted to weigh the evidence at this stage.  Accordingly, NSU's motion for summary judgment is DENIED as to Plaintiff's hostile work environment claim.

### B.  Count II - Rehabilitation Act Claims

Plaintiff next appears to raise both a discrimination claim and a retaliation claim under the Rehabilitation Act.  The Court addresses each claim in turn.

### a. Discrimination

"The Rehabilitation Act prohibits recipients of federal funding, like [NSU], from discriminating on the basis of disability." *Hwang v. Kansas State University*, 753 F.3d 1159, 1161 (10th Cir. 2014). "To establish a prima facie case of discrimination under the Rehabilitation Act, [Plaintiff] must show (1) that she was disabled within the meaning of the ADA, (2) that she was qualified for the job she held, and (3) that she was discriminated against because of her disability. Plaintiff's burden at this *McDonnell Douglas* stage is not an onerous one." *Stewart v. Mountainland Tech. Coll.*, 2023 WL 1864288, at *14 (D. Utah Feb. 9, 2023) (*citing Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015) and *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000)). Furthermore, Plaintiff has the burden to "articulate with precision both h[er] physical or mental impairment and the major life activity the impairment substantially limits." *Parker v. Salazar*, 431 Fed. Appx. 697, 699 (10th Cir. 2011). The Court finds Plaintiff fails to carry her burden of establishing a prima facie case of discrimination because she does not establish she is disabled for purposes of the Rehabilitation Act. *Parker v. Salazar*, 2010 WL 11519595, at *5 (D. Wyo. Sept. 22, 2010) ("[M]erely having either a medical condition or an impairment does not make one disabled for purposes of the ADA.") (*affirmed*, 431 Fed. Appx. 697 (10th Cir. 2011)).

For purposes of the Rehabilitation Act (and the ADA), the Tenth Circuit defines "disability"[6] as "(A) a physical or mental impairment that substantially limits one or more

---

[6] Plaintiff asserts that the first element, requiring her to establish her disability, is not challenged by Defendant, so does not even address it or attempt to support it. Docket No. 119, p. 25. While

of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004) (citing 42 U.S.C. § 12102(1)).  "To meet the first definition, 'a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities.'" *Kennedy v. Life Care Centers of Am.*, 2023 WL 155874, at *4 (D. Colo. Jan. 11, 2023) (*quoting Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (*quoting Berry v. T– Mobile USA, Inc.,* 490 F.3d 1211, 1216 (10th Cir. 2007)).

Plaintiff identified a seizure disorder in her Amended Complaint as her disability, and notes that her seizure disorder is cardiac-related, rather than due to epilepsy.  During her deposition, she also testified that she had a stroke in 2006.  Docket Nos. 13, pp. 2-3, ¶ 7 & 114, Ex. 2, pp. 250-253.  Plaintiff further testified that she never notified anyone at NSU of her stroke history, but that she notified Dr. Reif and the HR department of her seizure disorder in both written and oral statements, although she presents no record or specific recollection of these notifications.  Docket No. 114, Ex. 2, pp. 253-254.  Plaintiff took FMLA leave five times over five years:  (i) when her father was dying of cancer, (ii) after being hospitalized for a seizure, (iii) to take care of her mother after a fall and subsequent injury, (iv) to take care of her daughter during an illness, and (v) for

---

the organization of NSU's summary judgment motion and brief is somewhat difficult to follow, NSU clearly challenges whether Plaintiff has established a disability under the Rehabilitation Act. Docket No. 114, p. 21 ("c").

hospitalization and recovery from a seizure. *Id.*, pp. 261-262. She was approved for every FMLA request she made. *Id.*, p. 261.

NSU contends Plaintiff never notified them of her stroke, and that she never requested an accommodation for any disability. Plaintiff contends that her FMLA leave *was* a request for accommodation for her cardiac seizure disorder disability. Even assuming the presence of Plaintiff's cardiac-related seizures and that Plaintiff notified NSU of them, Plaintiff presents no evidence as to how her impairment substantially limits one or more major life activities "in any severe, long term or permanent manner relative to the average person in the general population." *Parker*, 2010 WL 11519595, at *6 (D. Wy. Sept. 22, 2010), *affirmed in Parker*, 431 Fed. Appx. at 699 ("The court noted that Mr. Parker did not identify a major life activity he asserted was substantially limited.").

"A 'major life activity' is a basic activity that the average person in the general population can perform with little or no difficulty. Major life activities as defined by the ADA are functions such as 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.'" *Kennedy*, 2023 WL 155874, at *4 (D. Colo. Jan. 11, 2023) (*quoting* 42 U.S.C. § 12102(2)(A)) (internal citations omitted). Indeed, Plaintiff presents no medical evidence at all in furtherance of this claim nor is there evidence NSU regarded Plaintiff as disabled, *i.e.*, limited in any major life activity. *Schobert v. CSX Transportation Inc.*, 504 F. Supp. 3d 753, 788-789 & n.6 (S.D. Ohio 2020) ("[T]he long-term existence of an impairment in itself is not sufficient to establish a disability under the ADA or the Rehabilitation Act. Plaintiffs must also establish that their

physical impairments substantially limit a major life activity.") (internal citations and quotations omitted).  Dr. Reif submits copies of Plaintiff's FMLA paperwork approving her leave, but this is likewise unhelpful.  Docket No. 115, Exs. 19-23.  None of the paperwork indicates the exact nature of the leave (*i.e.*, ascribing a disability to the Plaintiff or discussing medical information), although some forms specify whether the leave was for Plaintiff or a family member.  Additionally, the paperwork shows no limitations applicable to Plaintiff upon her return from FMLA leave at any time.  Docket No. 115, Exs. 19-23.  *See, e.g.*, *Ejiogu v. Grand Manor Nursing & Rehab. Ctr.*, 2017 WL 1184278, at *13 (S.D.N.Y. Mar. 29, 2017) ("Ejiogu has not demonstrated, however, that Graves' disease constitutes a "disability" under the Rehabilitation Act.  Nor has she offered evidence to suggest that Grand Manor knew that her request for FMLA leave was a request for an accommodation for this disability.").

In sum, Plaintiff took FMLA leave at least five times, but only twice for herself. Upon her return each time, she had no identifiable limitation(s).  The evidence in the record, including her FMLA paperwork, does not identify a physical or mental impairment that substantially limits one or more major life activities.  Accordingly, Plaintiff fails to establish that she suffers from a disability that would provide her protection under the Rehabilitation Act sufficient to meet her burden under the *McDonnell Douglas* burden-shifting paradigm.  Therefore, NSU is entitled to summary judgment on this claim.

### b.  Retaliation

"The standard for retaliation claims under the Rehabilitation Act is the same as the standard for retaliation claims under the Americans with Disabilities Act ("ADA"),"

*Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010), and likewise follows the *McDonnell Douglas* burden-shifting framework. "[Plaintiff] can establish a prima facie case by showing: (1) that she engaged in protected activity; (2) that she suffered a materially adverse action by [NSU] either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action." *Reinhardt*, 595 F.3d at 1131 (*citing Proctor*, 502 F.3d at 1208). NSU must then produce evidence of a legitimate, nonretaliatory reason for the adverse action. If so, the burden shifts back to Plaintiff to show NSU's proffered reason is pretextual. *Id.*

The analysis for FMLA leave is not identical to the analysis for claims under the ADA and Rehabilitation Act. *Berry*, 490 F.3d at 1219 ("[T]he leave provisions of the FMLA are wholly distinct from the statutory definition of "disability" and an employer's reasonable accommodation obligations covered under the ADA. As courts have recognized in various contexts, there may be some parallels between the ADA and FMLA, but applicable regulations explicitly state that ADA's 'disability' and the FMLA's 'serious health condition' are different concepts, and must be analyzed separately.") (quotations omitted) (collecting cases). For most retaliation claims, Plaintiff would not be required to allege an actual disability, but the Rehabilitation Act *does* require Plaintiff to "adequately allege a disability." "[A]s a general matter, a plaintiff need not allege a 'disability' in order to bring a retaliation claim. Instead, the plaintiff must merely allege that he or she engaged in activity protected by the Rehabilitation Act. Here, though, given the specific nature of the alleged conduct at issue (taking FMLA leave), in order to plausibly allege that the conduct represented protected activity under the Rehabilitation Act, as opposed merely to

35

conduct under the FMLA, the plaintiffs must adequately allege a disability." *Schobert*, 504 F. Supp. 3d at 788 n.6.  As discussed above, Plaintiff fails to meet this requirement despite the low threshold.

Furthermore, it is unclear whether Plaintiff's FMLA application is sufficient to meet the first element of establishing her prima facie case, engagement in a protected activity. The Tenth Circuit has not definitively ruled on this, but "the Court of Appeals for the Fifth Circuit has held that 'a request for FMLA leave is not a request for a reasonable accommodation under the ADA.'"  *See also Arms v. Milwaukee Cnty. (Dep't on Aging)*, 2019 WL 1981036, at *5 (E.D. Wis. May 1, 2019) (*quoting Acker v. General Motors, L.L.C.*, 853 F.3d 784, 791-792 (5th Cir. 2017) ("Thus, an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job.") (emphasis in original).  Like the District Court in Wisconsin, this Court finds the Fifth Circuit's analysis persuasive.  Accordingly, the Court finds Plaintiff fails to carry her burden at this stage of proceedings.  NSU is thus entitled to summary judgment on Plaintiff's claim for retaliation under the Rehabilitation Act.

### C.  Count III - FMLA Retaliation Claim

Plaintiff's final claim is retaliation for use of leave protected under the FMLA, raised solely as to Dr. Reif in his individual capacity.  Dr. Reif first contends that the FMLA was not created to hold individuals liable, and that he does not fit the definition of "employer" under the statute, nor did Plaintiff fit the definition of his "employee."  This Court previously found, at the motion to dismiss stage, that Plaintiff sufficiently alleged a

plausible *claim* that Dr. Reif could be an employer. Dr. Reif now contends that he does not have the same benefits or resources of an employer such as NSU, does not retain the ability to make final decisions, and should therefore not be delegated the same liability as an employer. Additionally, he asserts that the Court did not discuss the requirement that an employer employ 50 or more employees, and that the FMLA was intended to hold employers responsible for the actions of their employees, but not the other way around.

Contrary to Plaintiff's representations, under the FMLA, Plaintiff must affirmatively establish that Defendant Reif was her employer. *Miles v. Unified School Dist. No. 500, Kansas City*, 347 F.Supp.3d 626, 629 (D. Kan. 2018) ("When a plaintiff brings an FMLA retaliation or discrimination claim, plaintiff must establish that the defendant is her employer.") (*citing* 29 U.S.C. § 2615(a)(1), (2)). Although "the Tenth Circuit has not decided whether individuals may be held liable under the FMLA . . . the plain language of the statute and the implementing regulations suggest as much. Further, district courts in this circuit have widely concluded that individuals may be held liable as "employers" under the FMLA." *Zisumbo v. Convergys Corp.*, 2020 WL 3546794, at *11 (D. Utah June 30, 2020) (collecting cases). *See also Cordova v. New Mexico*, 283 F. Supp. 3d 1028, 1039 (D.N.M. 2017) ("The Court therefore concludes that the FMLA subjects an employee of a public agency 'who acts . . . in the interest of an employer to any of the employees of such employer' to individual liability for violations of the statute.").

Under the FMLA, the term "employer":

(i)   means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working

> day during each of 20 or more calendar workweeks in the current or
> preceding calendar year;
> (ii)    includes
>     (I)    any person who acts, directly or indirectly, in the interest of an
>         employer to any of the employees of such employer; and
>     (II)    any successor in interest of an employer;
> (iii)    includes any "public agency", as defined in section 203(x) of this title; and
> (iv)    includes the Government Accountability Office and the Library of Congress.

29 U.S.C. § 2611(4)(A). When questions arise as to the whether an individual or entity is a plaintiff's employer in the context of the FMLA, district courts apply the "economic-reality test" to determine whether an employment relationship existed. *Saavedra v. Lowe's Home Centers, Inc.*, 748 F. Supp. 2d 1273, 1292-1293 (D. N.M 2010). *See also Zisumbo*, 2020 WL 3546794, at *12 (noting the Tenth Circuit applies the "economic reality" test under the Fair Labor Standards Act ("FLSA"), which uses identical language defining "employer," and that the Tenth Circuit has looked to "FLSA caselaw to interpret analogous FMLA provisions in the past."). The economic-reality test requires the Court to assess, under the totality of the circumstances, "whether the alleged individual [i] has the power to hire and fire employees; [ii] supervises and controls employee work schedules or conditions of employment; [iii] determines the rate and method of payment; and [iv] maintains employment records." *Gnapi v. Am. Farmers & Ranchers Mut. Ins. Co.*, 2022 WL 1213131, at *2 (W.D. Okla. Apr. 25, 2022) (citation omitted). *See also Zisumbo*, 2020 WL 3546794, at *11 (same) (*quoting Saavedra*, 748 F. Supp. 2d at 1292). "When applying the economic reality test in the context of individual liability under the FMLA, courts have considered the defendant's control over and involvement in the plaintiff's ability to take FMLA leave and return to work." *Cordova*, 283 F. Supp. 3d at 1040. *See*

*also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("Since economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition.") (emphasis in original) (*citing Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730 (1947) (whether an employer-employee relationship exists does not depend on isolated factors but rather "upon the circumstances of the whole activity.")).

The second factor is easily met.  It is clear from the undisputed evidence, including annual reviews, that Dr. Reif supervised Plaintiff and controlled her work schedule and conditions of employment.  *See, e.g.*, Docket No. 115, Exs. 3 & 16, p. 4 & Docket No. 119, Ex. 5, p. 4.  The other factors are less clear.  First, there is no real evidence as to the third factor (her rate and method of payment), although it appears Dr. Reif's annual reviews included whether she would be eligible for a salary increase adjustment.  Docket Nos. 115 & 116.  Dr. Reif contends that he had limited decision-making power such that he did not have the power to hire and fire Plaintiff or determine the rate and method of her payment, nor did he maintain employment records.  Furthermore, he contends he did not have control over her ability to take FMLA leave and return to work, nor did he make the executive decision to fire her.  Dr. Reif submits an Affidavit from Jean Logue, NSU's Director of Human Resources ("HR"), which indicates that the HR team had the final say in approving leave and that, while Dr. Reif had to approve or deny requests, his oversight was procedural rather than discretionary.  Docket No. 115, Ex. 7.  Additionally, Ms. Logue indicates that she is the one who recommended Plaintiff's employment be terminated, and that she made this recommendation to NSU Vice President Christy Landsaw.  *Id.*  Ms. Clifton signed a

declaration as General Counsel for NSU, stating that she investigated Plaintiff's claims against Dr. Reif and that Dr. Reif did not have the final authority to terminate Plaintiff. *Id.*, Ex. 8. Ms. Landsaw, as VP of Administration and Finance at NSU, completed a declaration stating that Dr. Reif did not have the final authority to approve or deny FMLA leave, nor did he have final decision-making power as to her employment benefits, including her pay. *Id.*, Ex. 11. She also states that she made the decision to terminate Plaintiff before she was aware Plaintiff took FMLA leave in July 2018. *Id.* She testified at a deposition that Dr. Reif provided information regarding "performance deficiencies" in support of Plaintiff's termination. Docket No. 120, Ex. 19, p. 3, ln. 1-7. And Ms. Landsaw is the person who signed the letter memorializing Plaintiff's August 16, 2018 termination. Docket No. 115, Ex. 15. Plaintiff's FMLA leave forms indicate approval was always made by HR employees, while Dr. Reif signed as an "Account Sponsor" and as a notification acknowledgement. *Id.*, Exs. 19-23.

Plaintiff contends that Dr. Reif does not provide sufficient factual support for the economic reality test, and asserts that Dr. Reif was clearly her supervisor, maintained her performance records, and was a key person in the termination decision. For these reasons, she asserts that he is responsible for the alleged violation of her rights under the FMLA. Under the totality of the circumstances, the Court finds that he is not. Dr. Reif supervised and controlled Plaintiff's work schedule and conditions of employment, and certainly contributed to the decision to fire her. However, there is no evidence that he maintained Plaintiff's employment records, or controlled her ability to take FMLA leave despite receiving notifications when she was approved for it. Plaintiff contends he expressed

increasing frustration over her health issues, Docket No. 120, p. 12, ¶ 37, and that he wanted her fired for taking medical leave.  Plaintiff's citations, though, *see* Docket No. 120, p. 12, ¶ 37 & Exs. 26, 27 & portions of Ex. 20, indicate only that he expressed concerns regarding how Plaintiff *recorded* her FMLA leave or used comp time.

"When determining individual liability, courts often emphasize the first and last factors, that is, the power to hire and fire and control over the ability to take FMLA leave." *Burke v. Gen. Servs. Dept.*, 2019 WL 5684524, at *3, 5 (D.N.M. Nov. 1, 2019) ("Though not dispositive of this issue, courts often emphasize the first factor more than any other.") (*citing Saavedra*, 748 F. Supp. 2d at 1293).  Although Dr. Reif certainly contributed to the decision to fire Plaintiff, he was not the ultimate decisionmaker.  Nor did he have approval power over her FMLA leave, which was handled by the HR department.  Indeed, the only factor wholly attributable to Dr. Reif is the second, his supervision of her schedule and conditions of employment as evidenced by his annual reviews discussing, *inter alia*, arriving at work promptly on time management, communication, and annual work goals. *Cf. Burke*, 2019 WL 5684524, at *5 (D.N.M. Nov. 1, 2019) ("*Saavedra, Cordova*, and *Freemon* [*v. Foley*, 911 F. Supp. 326 (N.D. Ill. 1995)] all relied upon allegations or evidence that the individual defendant *both* had the ability to fire the plaintiff and controlled the plaintiff's FMLA leave.").   Accordingly, the Court declines to find that Dr. Reif's *input* in the decision to terminate Plaintiff's employment outweighs his inability to fire her on his own and, importantly here, his lack of authority over approval or denial of her FMLA leave.  There is no genuine issue of material fact as to whether Dr. Reif fits the

definition of "employer" under the FMLA, and his motion for summary judgment is therefore GRANTED.

The Court further finds that Dr. Reif is entitled to qualified immunity here. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. 2014) (emphasis added) (*quoting Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) and *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). And "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (*quoting Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). As discussed above, neither the Tenth Circuit nor the Supreme Court have determined whether an individual can be held liable as an employer under the FMLA. Because the law is not clearly established on this point, Dr. Reif is thus entitled to qualified immunity.

## CONCLUSION

Accordingly, Defendant Northeastern State University's Motion for Summary Judgment and Brief in Support [Docket No. 114] is GRANTED IN PART and DENIED IN PART. NSU is entitled to summary judgment on Plaintiff's Title VII claims of gender discrimination, race discrimination, and retaliation, as well as Plaintiff's claims of discrimination and retaliation under the Rehabilitation Act, but NSU is not entitled to summary judgment on Plaintiff's hostile work environment claim pursuant to Title VII.

Defendant [Richard Reif's] Motion for Summary Judgment and Brief in Support [Docket No. 115] is hereby GRANTED.

DATED this 29th day of March, 2023.

_____

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**