**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARCI D. WALKINGSTICK DIXON,

Plaintiff - Appellant,

v.

STATE OF OKLAHOMA, ex rel. REGIONAL UNIVERSITY SYSTEM OF THE OKLAHOMA BOARD OF REGENTS, d/b/a Northeastern State University; RICHARD REIF, individually; SHEILA SELF, individually; BRIANA CLIFTON-DRURY, individually,

Defendants - Appellees.

No. 24-7016

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:19-CV-00391-GLJ)**

---

Mark Hammons, Hammons, Hurst & Associates, Oklahoma City, Oklahoma, for Plaintiff – Appellant.

Lexie P. Norwood, Assistant Attorney General (Dixie L. Coffey, Assistant Attorney General, with her on the brief), Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Defendants – Appellees.

---

Before **MATHESON**, **MORITZ**, and **FEDERICO**, Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

Marci Walkingstick Dixon worked at Northeastern State University ("NSU"). Richard Reif was her supervisor. After NSU fired her, she sued NSU for Title VII sex and race discrimination and Title VII retaliation. She sued Dr. Reif for retaliation under the Family and Medical Leave Act ("FMLA"). The district court granted NSU and Dr. Reif summary judgment on these claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse on the Title VII claims and affirm on the FMLA claim.

## I. BACKGROUND

### A. *Factual History*[1]

Ms. Walkingstick, a Native American woman and member of the Cherokee Nation, began working in NSU's Information Technology Services Department ("IT") in 2013.[2]

#### 1. Events Before Ms. Walkingstick's Human Resources Complaint

In 2015, Dr. Reif became Ms. Walkingstick's supervisor. She points to comments he made as relevant to her suit.

- He asked about the origin of her last name.

---

[1] On appeal from summary judgment, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018) (quotations omitted). We present this factual history accordingly.

[2] We join the parties in referring to the Appellant as "Ms. Walkingstick."

- He asked to use her notes as meeting minutes. She declined because she believed Dr. Reif "regularly assigned females to gender-stereotypical jobs." App., Vol. II at 375.

- He commented that the Chief of the Keetoowah Band of Cherokee Indians was "slow and not very smart and not a good leader." App., Vol. III at 461.

- He "made comments [to her] such as 'You're in a good mood, your husband must be out of town,'" *id.* at 573, and "why don't you girls take care of" organizing, planning, and cleaning for office parties. App., Vol. I at 103.

In 2015, 2016, and 2017, Dr. Reif completed performance evaluations for Ms. Walkingstick and marked that she "Me[t] Expectations" for all her job duties and evaluation criteria. *Id.* at 147-51 (2015); *id.* at 154-58 (2016); App., Vol. III at 422-27 (2017). Each evaluation mentioned areas for improvement but also contained positive comments.

Around January 2018, Ms. Walkingstick heard Dr. Reif say, "Let me be the dick and take this to them," App., Vol. I at 99-100; "Let's have a powwow," *id.* at 108; and "I don't want you going on a warpath," *id.* at 110. She reported Dr. Reif's comments to NSU's Title IX officer. According to Ms. Walkingstick, language in the IT department improved after her report, but Dr. Reif became more hostile.

In March 2018, Ms. Walkingstick called in sick for two days because she had a seizure. App., Vol. III at 472. In April, she told Dr. Reif she wanted to report those days as compensatory ("comp") time because she had worked 30 hours over spring break. "He sort of said okay or shrugged and walked off." *Id.* On her March leave report, she listed her two sick days as comp time. When Dr. Reif received the report,

he told her she could not list those days as comp time and to correct the report, which she did. *Id.* at 472-73.

On May 4, 2018, Dr. Reif emailed Ms. Walkingstick as follows:

> When you filled out last month's leave report, you did not use vacation or personal days for two days that you have called in sick. I acknowledge that you worked during the following spring break but I need to remind you that exempt employees do not get comp time. The[re] is a very informal and undocumented practice at NSU of granting comp time in unusual occasions but **ONLY** at the supervisors [sic] discretion and with **prior** approval. You did not get my approval prior to your submission of the leave report.
>
> I know that you are very well aware of exempt vs non-exempt leave policy. . . . You are not exempt from the very same rules that you are enforcing.
>
> Please consider this email as an official reprimand.

App., Vol. I at 113.

2. **Ms. Walkingstick's Complaint**

On May 4, 2018, Ms. Walkingstick responded to Dr. Reif's official reprimand email and copied NSU's Human Resources ("HR") Director, Jean Logue, and NSU's Title IX officers. In the email, she disputed Dr. Reif's claims. She asserted that (1) she informed him about the comp time and corrected the leave report when asked, (2) he did not follow university policy before issuing an official reprimand, and (3) he stated at a meeting that "there is leeway given" for comp time "at the supervisor's discretion but there were no specific details on what leeway meant." *Id.* at 132. She then wrote:

> The current working environment is very upsetting to me since [it] appears that you support different "practices" for different people in the department. Your email and reprimand confirms that I am being singled out for different rules, policies, practices, and treatment. Additionally, this and other events contribute further to the existing hostile environment you and others have created for me here.
>
> I have often felt that you have been hostile towards me, used racist and sexist language towards me, and apply your version or different university "practices" and policy towards me. Because of the long term nature and seriousness of the situation, I feel that I need to ask that HR, Title IX officers, and Christy [Landsaw, NSU's vice president of administration and finance] assist me with an appeal to this reprimand, to file a formal complaint, and to conduct a thorough investigation so that things can be resolved.

*Id.* at 132. NSU understood this email to be a formal complaint.

3. **Events Following Ms. Walkingstick's Complaint**

a. *Compensatory time issue*

After Ms. Walkingstick submitted her complaint, Dr. Reif, Ms. Logue, and Ms. Landsaw began characterizing Ms. Walkingstick's March 2018 time report claiming comp time as a "falsified leave report." *Id.* at 161; *see id.* at 88; *id.* at 140; App., Vol. III at 661. Ms. Logue submitted a declaration saying she "looked into [Ms. Walkingstick's] prior leave reports" and claimed Ms. Walkingstick "had falsified her leave reports in two other instances." App., Vol. I at 161. She eventually sent an email to Dr. Reif and NSU's general counsel on August 13, 2018, describing these two other leave report "discrepancies" and concluding, "I believe we now have additional evidence needed." App., Vol. III at 655.

Other NSU employees described the comp time policy as unclear, possibly unfair, or arbitrarily enforced. *Id*. at 643 ("I question the fairness of flex time."); *id.* at 646 ("[E]ach director has own way to deal w/overtime flex/comp."); *id.* at 649 ("Flex/comp - No clarity about this."). Ms. Landsaw also testified that NSU considers a written reprimand a low level of discipline. App., Vol. IV at 867. Ms. Walkingstick testified at her deposition that claiming comp time was "a common practice in IT, because a lot of the work we did was after hours or on weekends." App., Vol. III at 473.

b. *FMLA leave*

While her complaint was pending, Ms. Walkingstick took FMLA leave from June 4 to June 25, 2018, due to her and her daughter's health issues.[3]

On July 23, 2018, Ms. Logue met with NSU's HR assistant director, NSU's general counsel, and Dr. Reif. Ms. Logue took notes about the meeting and titled them "Marci Walkingstick Leave Discussion." *Id*. at 612; *id.* at 535-42. She wrote, "Discussed 'Key' employee—Marci does not fall in the top 10% of employees based on salary." *Id*. at 612; *see also id.* at 613 (calculating Ms. Walkingstick's hours of FMLA leave); *id.* at 539-40. As we discuss further below, this information is relevant because the FMLA generally requires an employer to reinstate an employee upon return from FMLA leave. 29 C.F.R. § 825.214. But under certain

[3] Ms. Walkingstick also took FMLA leave from January 3 to January 22, 2018, and in 2016 and 2017.

circumstances, an employer may deny reinstatement to a "key employee." *Id.* § 825.218(a). A "key employee" is an "employee who is among the highest paid 10 percent of all employees employed by the employer within 75 miles of the employee's worksite." *Id.* § 825.217(a).

c. *Ms. Walkingstick's interview and the investigation written statement*

On July 27, 2018, investigators interviewed Ms. Walkingstick. She "repeated her race and gender complaint and provided additional detail of harassing/discriminatory treatment." App., Vol. II at 382; *see also* App., Vol. III at 638-41. Investigators documented this additional detail in a written investigation statement, describing situations where Ms. Walkingstick felt Dr. Reif had "singled [her] out" and discriminated against her. *Id.*

d. *Dr. Reif's letter*

On August 7, 2018, Dr. Reif sent a letter to the investigators, writing that he "f[ound] the allegation of sexism and racism as insulting to [his] very core" and "request[ed] that th[e] committee give [him] [his] options to file a complaint of defamation of character." *Id.* at 637.

e. *August 15 meetings and notes*

On August 15, 2018, Ms. Logue took the following notes before a meeting with Dr. Reif and NSU's general counsel to discuss Ms. Walkingstick:

- plan - restructure
- false claim
  - theft of property (emails etc.)
  - can we show copy or delivery to home emails?
  - can we find evidence of gross misconduct on L Drive?
- Reduction in force
- Term -
  - false claims
  - performance - gross?
  - falsification of records?

*Id.* at 660; *see also id.* at 552-53; Oral Arg. at 30:00-30:03 (confirming that Ms. Logue took the notes on August 15). Appearing below these notes were her meeting notes discussing issues about Ms. Walkingstick's performance. App., Vol. III at 660; *id.* at 551-52. The notes mention a "[b]acklog of tickets," "no communication" about a program she had to implement, and a failure to change a student's username in NSU's system after the student's divorce. *Id.* at 660.

The following page contained more of Ms. Logue's notes from what she "believe[d] . . . was a separate meeting," *id.* at 553, that also listed issues about Ms. Walkingstick's performance, *id.* at 661. The notes mention "Leadership," issues with programs she had to implement, a "Backlog of tickets," "falsification of leave records," "Customers refusing to work with [her]," "Attitude towards customers," and "Refusing to change user ID's to reflect legal name following divorce from abusive spouse." *Id.* at 661; *id.* at 552-53.[4] Below these notes, Ms. Logue wrote the date and time for Ms. Walkingstick's termination—"8/16/18 2:00." *Id.* at 661; *id.* at 553.

[4] Neither Ms. Logue's notes nor her deposition identifies the attendees at that meeting.

f. *Ms. Walkingstick's termination*

On August 16, 2018, NSU fired Ms. Walkingstick. App., Vol. I at 203. The termination letter cited her "negative attitude toward new projects, the poor reputation this attitude has given the entire IT department across campus, [her] failure to roll out projects in a timely manner, [her] division's backlog of tickets, and [her] failure to properly report time off." *Id.* At a deposition, NSU's HR assistant director acknowledged that "the timekeeping issue [was] the main reason she was discharged." App., Vol. III at 666.

After Ms. Walkingstick's termination, NSU hired a replacement.

## B. ***Procedural History***

Ms. Walkingstick sued NSU for Title VII sex and race discrimination, 42 U.S.C. § 2000e-2(a)(1), and for Title VII retaliation, *id.* § 2000e-3(a). She sued Dr. Reif for FMLA retaliation. 29 U.S.C. § 2615. With the parties' consent, the district court referred the case to a magistrate judge. *See* 28 U.S.C. § 636(c)(1).

### 1. **Summary Judgment**

NSU and Dr. Reif moved for summary judgment. On the Title VII discrimination and retaliation claims, the magistrate judge applied the *McDonnell Douglas* burden-shifting framework, under which "the plaintiff has the burden of presenting a prima facie case of discrimination. The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (citation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then

moves back to the plaintiff to "prove the employer's articulated reasons are pretextual." *Throupe*, 988 F.3d at 1251.

a. *Title VII discrimination*

The magistrate judge granted NSU summary judgment on Ms. Walkingstick's sex and race discrimination claims, finding she could not establish a prima facie case of discrimination or show her firing was pretextual.

i. Prima facie case

For her prima facie case, the magistrate judge said Ms. Walkingstick needed to show "[i] that she is a member of a protected class, [ii] she suffered an adverse employment action, and [iii] the challenged action occurred under circumstances giving rise to an inference of discrimination." App., Vol. V at 991 (quoting *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 & n.1 (10th Cir. 2015)); *see id.* at 998. The parties contested only the third element.

The magistrate judge faulted Ms. Walkingstick for "using an older four-part formulation for a prima facie case" and "baldly assert[ing] that she ha[d] made a prima facie case because her [race and] gender [are] . . . protected categor[ies], she was qualified for her job, she was involuntarily dismissed, and her job continued to exist after she was terminated." *Id.* at 992 (footnote omitted); *see id.* at 998-99. He determined that Ms. Walkingstick failed to raise an inference of sex discrimination because she "d[id] not present any facts that [the allegedly sexist] events occurred in close proximity to one another or to [her] termination," and she did not show that "she was treated differently than similarly situated employees." *Id.* at 993. On race

discrimination, he said she did not identify a similarly situated employee, and the allegedly racist comments did not "give rise to an inference of race-based discrimination leading to her termination." *Id.* at 999-1000.

ii. Nondiscriminatory reasons

The magistrate judge concluded that NSU offered legitimate, nondiscriminatory reasons for Ms. Walkingstick's termination, which it "summed up in two categories: poor job performance and improper timekeeping." *Id.* at 994; *id.* at 1000.

iii. Pretext

The magistrate judge found that Ms. Walkingstick failed to show the poor job performance rationale was pretextual because (1) she presented only "her subjective opinion of her performance," which did "not establish pretext," and (2) her performance evaluations included some of the same issues cited in her termination letter. *Id.* at 995-96; *see id.* at 1000-01.

He also found that Ms. Walkingstick failed to show that the improper timekeeping rationale was pretextual because (1) "it is undisputed that Dr. Reif sincerely believed she had violated a policy" and (2) "it is undisputed that NSU . . . clearly believed she had committed this infraction and acted in good faith upon that belief by noting the timekeeping issue in her termination letter." *Id.* at 995; *see id.* at 1000-01.

b. *Title VII retaliation*

The magistrate judge granted NSU summary judgment on Ms. Walkingstick's retaliation claim, finding that she failed to establish a prima facie case or show pretext under the *McDonnell Douglas* framework. App., Vol. V at 1006-07.

i. Prima facie case

For a prima facie case of retaliation, the magistrate judge said Ms. Walkingstick needed to show "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* at 1002 (quoting *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019)).

He found that Ms. Walkingstick's July 27, 2018 interview with NSU investigators was not protected activity because she "merely 'repeated' her earlier claims" from her initial May 4, 2018 complaint. *Id.* at 1003. On causation, he measured the time between Ms. Walkingstick's May 4, 2018 complaint and her termination, *id.* at 1003-04, and noted that a "more-than-three month gap, standing alone, is insufficient to establish causation," *id.* at 1004.

The magistrate judge next determined that Ms. Walkingstick had not "set forth additional evidence to support her prima facie claim." *Id.* at 1004-06. He said Ms. Walkingstick's factual "assert[ions] that NSU was looking for reasons to fire her, that her performance issues were undocumented, and that they were looking for ways

to deny her FMLA leave" did not show causation for her retaliation claim. *Id.* at 1005-06.

ii. Nondiscriminatory reasons

The magistrate judge said NSU proffered legitimate, nondiscriminatory reasons to fire Ms. Walkingstick—poor job performance and "failure to properly report time off." *Id.* at 1006.

iii. Pretext

The magistrate judge found that Ms. Walkingstick had not shown pretext for retaliation for the same reasons she had not shown pretext for discrimination. *Id.* at 1007.

c. *FMLA retaliation*

On the FMLA retaliation claim against Dr. Reif, the magistrate judge noted that "the Tenth Circuit has not decided whether individuals may be held liable under the FMLA." *Id.* at 1018 (quotations omitted). But he concluded, based on the statute's plain language and the consensus of Tenth Circuit district courts, that Ms. Walkingstick could sue Dr. Reif under the FMLA. *Id.* Ms. Walkingstick therefore needed to "affirmatively establish that [Dr.] Reif was her employer" under the FMLA. *Id.*

To make this determination, the magistrate judge applied the "economic reality test," which requires courts to determine "whether the alleged individual [i] has the power to hire and fire employees; [ii] supervises and controls employee work schedules or conditions of employment; [iii] determines the rate and method of

payment; and [iv] maintains employment records." *Id.* at 1019 (quotations omitted). After analyzing these factors, the magistrate judge concluded that Dr. Reif was not Ms. Walkingstick's employer and granted summary judgment to him on this claim. *Id.* at 1020-21.[5]

2. **Reconsideration**

Ms. Walkingstick moved for reconsideration, which the magistrate judge considered under Federal Rule of Civil Procedure 59(e). He again found that Ms. Walkingstick could not establish her prima facie case of discrimination solely by showing she was a qualified member of a protected class and was terminated and replaced. App., Vol. V at 1061-63. He said this evidence did not give rise to an inference of discrimination.

He also said Ms. Walkingstick's "refer[ences] to often undated and/or unsigned handwritten notes" did not establish pretext for any of her claims. *Id.* at 1065.

Ms. Walkingstick timely appealed the summary judgment and reconsideration orders.

---

[5] The magistrate judge also found that Dr. Reif was entitled to qualified immunity. App., Vol. V at 1023. Because we affirm under the FMLA, we do not reach this ruling.

## II. DISCUSSION

Ms. Walkingstick challenges the grant of summary judgment on her claims for (A) Title VII sex and race discrimination, (B) Title VII retaliation, and (C) FMLA retaliation. Aplt. Br. at 11-43.

"We review a district court's grant of summary judgment de novo, using the same standard applied by the district court pursuant to Fed.R.Civ.P. 56(a)." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). We will affirm a grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quotations omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A movant who does not bear the burden of persuasion at trial may satisfy this burden by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Savant Homes*, 809 F.3d at 1137 (quotations omitted); *see Celotex*, 477 U.S. at 325. "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Savant Homes*, 809 F.3d at 1137 (quotations omitted); *see Celotex*, 477 U.S. at 324.

"[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We "view facts in the light most favorable to the non-mov[ants] . . . , resolving all factual disputes and reasonable inferences in their favor." *Cillo*, 739 F.3d at 461 (quotations omitted).

### A. ***Title VII Discrimination Claims***

Title VII of the Civil Rights Act of 1964 prohibits employers from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual . . . , because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). Because Ms. Walkingstick attempts to establish her claims through circumstantial evidence, we apply "the familiar *McDonnell Douglas* burden-shifting framework." *Throupe*, 988 F.3d at 1251; *see also McDonnell Douglas Corp.*, 411 U.S. at 802.

As noted above, "[u]nder the *McDonnell Douglas* framework, the plaintiff has the burden of presenting a prima facie case of discrimination. The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions." *Throupe*, 988 F.3d at 1251 (citation omitted). The burden then moves back to the plaintiff to "prove the employer's articulated reasons are pretextual." *Id.*

The following analysis concludes that Ms. Walkingstick satisfied her burdens. We therefore reverse the magistrate judge's grant of summary judgment on the discrimination claims.

#### 1. **Prima Facie Case**

Ms. Walkingstick argues she satisfied her burden of showing prima facie cases of sex and race discrimination based on evidence that she is a Native American

woman who was qualified for her job, discharged, and replaced. Aplt. Br. at 19-22. We agree. The magistrate judge failed to recognize that this showing establishes a prima facie case.

a. *Legal background*

To establish a prima facie case of Title VII discrimination, a plaintiff who is a member of a protected class must show that she experienced an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981), and describing this standard as the "critical prima facie inquiry"). *McDonnell Douglas* held that a plaintiff could raise an inference of unlawful discrimination by satisfying certain prima facie case elements ("*McDonnell Douglas* elements"). *But see, e.g.*, *Burdine*, 450 U.S. at 253 n.6 (noting that *McDonnell Douglas* is "not inflexible"); *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1139 n.13 (10th Cir. 2024) (noting different ways to satisfy the prima facie test).

In *McDonnell Douglas*, the plaintiff alleged that his former employer had racially discriminated when it failed to rehire him. 411 U.S. at 796-97. The Supreme Court held the plaintiff satisfied his prima facie case by showing:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications.

*Id.* at 802. We also have permitted plaintiffs alleging wrongful termination to make out prima facie cases by establishing the *McDonnell Douglas* elements.

In *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999), we held that a plaintiff could establish her prima facie case for wrongful termination by showing "(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." *Id.* at 1135. We explained that "[t]he purpose behind the prima facie requirement established in *McDonnell Douglas* is to obligate a plaintiff to 'eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection.'" *Id.* at 1140 (quoting *Burdine*, 450 U.S. at 253-54). By satisfying these elements, the plaintiff "eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job." *Id.* "When viewed against a backdrop of historical workplace discrimination," a plaintiff who makes this showing necessarily "raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement." *Id.*

In *Kendrick*, we reaffirmed that a plaintiff may prove her prima facie case for wrongful termination based on the *McDonnell Douglas* elements. We held that the district court erred by requiring the plaintiff to show differential treatment of a similarly situated employee. 220 F.3d at 1226-29. We said the plaintiff established a prima facie case because (1) he was Black, (2) the employer did not challenge his

qualifications, (3) he was discharged, and (4) the employer hired new employees, which "indicate[d] that [the employer] was not downsizing at the time [the plaintiff] was discharged." *Id.* at 1129.

We have recognized other ways to establish an inference of discrimination for a prima facie case. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013) (explaining that there are several "variations" of the prima facie test); *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005) (same); *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008) (calling the *McDonnell Douglas* elements a "[g]eneral[] state[ment]" of a plaintiff's prima facie case for wrongful termination but emphasizing that "[t]he standard is flexible").[6] But we also have continued to recognize the elements set out in *McDonnell Douglas*, *Perry*, *Kendrick*, and numerous Tenth Circuit cases. *See*, *e.g.*, *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (explaining that "[i]n the canonical case of an employee who was discharged," a plaintiff may establish her prima facie case through the *McDonnell Douglas* elements); *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1008-09 (10th Cir. 2001) (holding that there was "no trouble concluding that [the plaintiff] ha[d] met his prima facie burden" because the plaintiff

[6] For example, a plaintiff may raise an inference of discrimination by showing "a nexus exists between the allegedly discriminatory statement and the company's termination decision," *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000), or "that the employer treated similarly situated employees more favorably," *Sorbo*, 432 F.3d at 1173.

satisfied the *McDonnell Douglas* elements).[7] We recently stated that a plaintiff may attempt to raise an inference of discrimination through any of these pathways. *See McNellis*, 116 F.4th at 1139 n.13.

In sum, a plaintiff alleging wrongful termination may raise an inference of unlawful discrimination by showing that (1) she is a member of a protected class, (2) she was qualified for her job, (3) she was fired, and (4) the job was not eliminated. *Perry*, 199 F.3d at 1140.

b. *Application*

The magistrate judge erred in faulting Ms. Walkingstick for using the *McDonnell Douglas* elements to establish her prima facie case and in concluding that she had failed to raise an inference of discrimination. App., Vol. V at 992-93; *see id.* at 998-99.

The magistrate judge noted the alleged sexist and racist conduct did not occur "in close proximity" to her termination and that Ms. Walkingstick did not show that "she was treated differently than similarly situated employees." *Id.* at 993, 999-1000. But these are not "indispensable element[s] of the prima facie case." *Sorbo*, 432 F.3d

[7] *See also, e.g.*, *Adamson*, 514 F.3d at 1150; *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017); *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1050-51 (10th Cir. 2020); *Painter v. Midwest Health, Inc.*, No. 21-3195, 2022 WL 17332734, at *3 (10th Cir. Nov. 30, 2022) (unpublished); *Nguyen v. Gambro BCT, Inc.*, 242 F. App'x 483, 488 (10th Cir. 2007) (unpublished); *Herrera v. United Airlines, Inc.*, 754 F. App'x 684, 690 (10th Cir. 2018) (unpublished).

We cite unpublished opinions for their persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

at 1173; *see McNellis*, 116 F.4th at 1139 n.13. A plaintiff who satisfies the *McDonnell Douglas* elements raises an inference of discrimination, *see Perry*, 199 F.3d at 1140, and Ms. Walkingstick did so.

First, as a Native American woman, Ms. Walkingstick is a member of two protected classes.[8]

Second, she was qualified for her job.[9] Dr. Reif marked that she met expectations on all her performance reviews from 2015 through 2017, which shows that she "possesse[d] the basic skills necessary for the job." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1421 (10th Cir. 1991) (quotations omitted). We have explained that the plaintiff need show only "some evidence of good performance." *Id.* Although the reviews mentioned areas for improvement, Ms. Walkingstick did not need to show "superiority or flawless performance." *Id.* (quotations omitted).[10]

Third, she suffered an adverse employment action because she was fired. *See, e.g.*, *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1216 (10th Cir. 2003) ("It

---

[8] NSU does not dispute this point. *See* Aplee. Br. at 14-18.

[9] NSU does not dispute on appeal that Ms. Walkingstick was qualified. *See* Aplee. Br. at 7-12, 14-16. It argues instead that the *McDonnell Douglas* elements do not raise an inference of discrimination. *Id.*

[10] "If an employer is dissatisfied with the performance of an employee," the employer "can properly raise the issue in rebuttal of the plaintiff's showing," not at the prima facie stage. *Denison*, 941 F.2d at 1421 (quotations omitted).

hardly requires stating that when an employer tells an employee that she no longer has a job, that employee's job status has been significantly and materially altered.").

Fourth, NSU did not eliminate her job after discharge—it replaced her.

Ms. Walkingstick therefore established a prima facie case on her sex and race discrimination claims. She raised an inference of discrimination "because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254.

2. **Nondiscriminatory Reasons**

After the plaintiff establishes her prima facie case, the defendant must produce evidence of a "legitimate, nondiscriminatory reason" for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quotations omitted). NSU stated two legitimate, nondiscriminatory reasons for her termination: "poor job performance and . . . improper timekeeping." Aplee. Br. at 19; *see* App., Vol. I at 203. Ms. Walkingstick does not dispute that NSU carried its burden. *See* Aplt. Br. at 11-25, 30-39. We therefore turn to pretext.

3. **Pretext**

Ms. Walkingstick argues she presented sufficient evidence to raise a genuine dispute of material fact regarding pretext. Aplt. Br. at 30-39. We agree.

a. *Legal background*

If the employer carries its burden to articulate a legitimate nondiscriminatory reason, "the burden shifts back to the plaintiff to demonstrate that the employer's justification is pretextual—not the true reason for the employment decision."

*DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotations omitted); *see id.* at 968-69 (applying the same substantive *McDonnell Douglas* burden shifting framework to claims outside Title VII).

"Pretext can be inferred from evidence revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations and quotations omitted); *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (same). "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Lounds*, 812 F.3d at 1234 (alterations and quotations omitted). "A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer*, 493 F.3d at 1168 (alterations and quotations omitted).

We have "definitively rejected a 'pretext plus' standard" that requires a plaintiff to "provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Id.* "The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003).

b. *Application*

Ms. Logue's notes from July 23 and August 15 show pretext. The July 23 notes about failing to reinstate a "key employee" under the FMLA permit a reasonable inference that NSU wanted to fire Ms. Walkingstick before it fully investigated her discrimination complaint. *See* App., Vol. III at 612. Indeed, the notes were written in a meeting four days before investigators interviewed Ms. Walkingstick about her complaint. *Id.* at 638. They discuss whether NSU could avoid reinstating Ms. Walkingstick following her FMLA leave. *Id*. at 612. A factfinder could therefore "rationally" find NSU's proffered nondiscriminatory reasons "unworthy of credence." *Lounds*, 812 F.3d at 1234 (quotations omitted).

The August 15 notes similarly demonstrate "weaknesses" and "implausibilities" in NSU's proffered nondiscriminatory reasons. *Id.* The notes list reasons for terminating someone, presumably Ms. Walkingstick because the reasons include "falsification of records" and "performance-gross?" App., Vol. III at 660. Ms. Logue wrote these notes before a meeting about Ms. Walkingstick's termination. *Id.* at 551-53.

The notes include reasons for termination that NSU did not mention in Ms. Walkingstick's termination letter: "restructur[ing]," "[r]eduction in force," and "theft of property (emails etc)." *Id.* at 660; *see also* App., Vol. IV at 835. The notes also say: "can we show copy or delivery to home emails?" and "can we find evidence of gross misconduct on L Drive?" *Id.* A reasonable juror could infer from these notes that NSU was grasping for reasons to fire Ms. Walkingstick.

The magistrate judge dismissed the July 23 and August 15 notes, stating they were "undated and/or unsigned." App., Vol. V at 1065. But Ms. Logue testified that she had written all the notes, dated her July 23 notes, and took the other notes before or during the August 15 meetings discussing Ms. Walkingstick's termination.

Although Ms. Logue's notes suffice to show a genuine factual issue on pretext, Ms. Walkingstick presented more pretext evidence. *See* Aplt. Br. at 34-38.

First, although Ms. Walkingstick's performance evaluations mentioned areas for improvement, they all showed that NSU was generally satisfied with her performance. An NSU official also testified that "the timekeeping issue [was] the main reason she was discharged," App., Vol. III at 666, and Dr. Reif testified that there was no documentation that he could recall of her performance issues, *id.* at 527-28. This evidence demonstrates further "weaknesses" in NSU's proffered explanation that it fired Ms. Walkingstick for poor performance. *Lounds*, 812 F.3d at 1234 (quotations omitted).

Second, Dr. Reif's official reprimand and other evidence about NSU's comp time policy undermine NSU's proffered explanation that it fired Ms. Walkingstick for improper timekeeping. Ms. Walkingstick testified that she thought Dr. Reif had approved her claiming comp time and that she corrected her leave report at Dr. Reif's request. Dr. Reif said in the official reprimand that NSU's practice of "granting comp time" is "very informal and undocumented." App., Vol. I at 113. Other IT employees commented on the lack of fairness, clarity, and uniformity surrounding NSU's comp time policy. Ms. Logue also sent an email on August 13 that described

two additional instances of misreported leave time and said, "I believe we now have additional evidence needed." App., Vol. III at 655.

In his official reprimand, Dr. Reif did not refer to Ms. Walkingstick's claiming comp time as sending "a falsified leave report," but NSU began to do so after Ms. Walkingstick complained of discrimination. App., Vol. I at 88; *see also id.* at 161. And Ms. Landsaw testified that NSU considers a written reprimand a low level of discipline. App., Vol. IV at 867. This evidence reveals "inconsistencies" in NSU's claim that it fired Ms. Walkingstick for improper timekeeping. *Lounds*, 812 F.3d at 1234 (quotations omitted).

Ms. Walkingstick provided sufficient evidence to permit a factfinder to "rationally" find NSU's proffered nondiscriminatory reasons "unworthy of credence." *Lounds*, 812 F.3d at 1234 (quotations omitted). She therefore carried her burden on summary judgment. She need not show that "the real reason" for her firing was discrimination because "the fact of pretext alone may allow the inference of discrimination." *Doebele*, 342 F.3d at 1135-36.

* * * *

In sum, Ms. Walkingstick presented sufficient evidence for a prima facie case of sex and race discrimination and to show that NSU's proffered nondiscriminatory reasons were pretextual. We therefore reverse the magistrate judge's grant of summary judgment on Ms. Walkingstick's sex and race discrimination claims.

B. ***Title VII Retaliation Claim***

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

A plaintiff may prove a Title VII retaliation claim through circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *Bekkem*, 915 F.3d at 1267. Because Ms. Walkingstick attempted to do so, we assess each of the *McDonnell Douglas* steps and conclude that Ms. Walkingstick satisfied them. We therefore reverse the magistrate judge's grant of summary judgment on this claim.

1. **Prima Facie Case**

Ms. Walkingstick argues she established her prima facie case because less than a month passed between her July 27, 2018 interview reporting discrimination and her termination on August 16, 2018. Aplt. Br. at 26-27. We agree.

a. *Legal background*

"To establish a prima facie case of retaliation, [a plaintiff] must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (quotations omitted).

i. Protected activity

Title VII protects an employee's opposition against "any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). "The term 'oppose,'" in Title VII "carries its ordinary meaning: to resist or antagonize; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (alterations, citations, and quotations omitted). "When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.* (alterations and quotations omitted). An employee who "report[s] discrimination in answering an employer's questions" opposes discrimination. *Id.* at 279-80.

ii. Adverse action

"Adverse employment action includes significant change in employment status, such as . . . firing . . . ." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotations omitted).

iii. Causal connection

A plaintiff may establish a causal connection by showing that an "adverse action closely follow[ed] protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). "[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation," but "we have held that a three-month period, standing alone, is

insufficient." *Id.* When a plaintiff has engaged in multiple protected activities, we measure the temporal proximity between the plaintiff's "last instance of protected activity" and the adverse employment action. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 804 (10th Cir. 2007).

b. *Application*

Ms. Walkingstick presented sufficient evidence on the elements for a prima facie case of retaliation to withstand summary judgment.

First, Ms. Walkingstick's July 27, 2018 interview with NSU investigators was protected opposition under Title VII. By "repeat[ing]" her sex and race discrimination complaint, App., Vol. II at 382, Ms. Walkingstick "communicate[d] to her employer a belief that the employer ha[d] engaged in . . . a form of employment discrimination," *Crawford*, 555 U.S. at 276.

The magistrate judge said Ms. Walkingstick's July 27, 2018 interview was not protected activity because she "merely 'repeated' her earlier claims." App., Vol. V at 1003. But Title VII contains no such limitation. *See* 42 U.S.C. § 2000e-3(a). An employee who repeats a complaint of unlawful discrimination "resist[s]" the discrimination just as much as an employee who makes a novel complaint. *Crawford*, 555 U.S. at 276 (quotations omitted). Also, Ms. Walkingstick added "detail[s]" to her initial complaint. App., Vol. II at 382; *see* App., Vol. III at 638-40.

Second, Ms. Walkingstick's termination was an adverse employment action. *See, e.g.*, *Wells*, 325 F.3d at 1216.

Third, Ms. Walkingstick has shown a causal connection because her termination "closely follow[ed]" her protected opposition. *Anderson*, 181 F.3d at 1179. Less than a month passed between Ms. Walkingstick's July 27, 2018 interview—her "last instance of protected activity," *PVNF*, 487 F.3d at 804—and her August 16, 2018 termination, which is sufficient "by itself" to establish causation, *Anderson*, 181 F.3d at 1179.

Because Ms. Walkingstick's July 27, 2018 interview was protected activity and she was fired three weeks later, she established her prima facie case of Title VII retaliation sufficient to defeat summary judgment.[11]

2. **Nondiscriminatory Reasons**

As with Ms. Walkingstick's discrimination claims, NSU stated two legitimate, nondiscriminatory reasons for her termination: "poor job performance and . . . improper timekeeping." Aplee. Br. at 19; *see* App., Vol. I at 203.

3. **Pretext**

Like Title VII discrimination claims, to show pretext for a Title VII retaliation claim, a plaintiff "must produce evidence of such weaknesses, implausibilities,

---

[11] Ms. Walkingstick also argues that Dr. Reif's August 7, 2018 letter to NSU's investigators supports her prima facie case of retaliation. Aplt. Br. at 28-30; Aplt. Reply Br. at 12. He wrote that he "f[ound] the accusation of sexism and racism as insulting to [his] very core," and he "request[ed] that th[e] committee give [him] [his] options to file a complaint of defamation of character." App., Vol. III at 637. Because we find that Ms. Walkingstick presented sufficient evidence to establish her prima facie case of retaliation apart from the letter, we need not decide whether the letter further supports her prima facie case.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (quotations omitted). The plaintiff "need not affirmatively demonstrate that retaliatory reasons motivated" the employer. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1120 (10th Cir. 2001).

Ms. Walkingstick's pretext showing for her Title VII retaliation claim was the same as for her Title VII discrimination claim. Her evidence would permit "a reasonable factfinder" to find NSU's proffered nondiscriminatory reasons "unworthy of credence." *Fye*, 516 F.3d at 1228.

* * * *

In sum, Ms. Walkingstick presented evidence on a prima facie case of Title VII retaliation and pretext sufficient to overcome NSU's summary judgment motion. We therefore reverse the magistrate judge's grant of summary judgment on Ms. Walkingstick's Title VII retaliation claim.

C. ***FMLA Retaliation Claim***

Ms. Walkingstick argues the magistrate judge should not have applied the economic reality test to determine whether Dr. Reif was her "employer" under the FMLA. Aplt. Br. at 39-42. We disagree and affirm summary judgment on this claim.

1. **Legal Background**

The FMLA permits eligible employees to take leave for serious health conditions and prohibits employers from retaliating against employees for doing so. *See* 29 U.S.C. §§ 2612(a), 2615(a)(2); *see Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170-71 (10th Cir. 2006).

The FMLA defines "employer" to "include[] . . . any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii). We have not addressed whether the FMLA permits an action for individual liability or how we determine whether a person "acts, directly or indirectly, in the interest of an employer." *Id.*

The Fair Labor Standards Act ("FLSA") similarly defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). We have permitted FLSA suits for individual liability, *see, e.g.*, *Hodgson v. Okada*, 472 F.2d 965, 968-69 (10th Cir. 1973), and we apply the economic reality test to determine whether there is an employee-employer relationship, *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1160 (10th Cir. 2018). Under that test, we examine:

> (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business.

*Acosta*, 905 F.3d at 1160.

Other circuits have concluded the FMLA's plain language permits claims for individual liability.[12] Because FMLA's "employer" definition "largely tracks" the FLSA's definition, other circuits also apply the FLSA's economic reality test to the FMLA. *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (collecting cases).[13]

2. **Application**

We join our sister circuits and hold that (1) the FMLA permits individual liability and (2) the economic reality test determines whether an individual qualifies as an FMLA employer.

---

[12] *See, e.g.*, *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 413 (3d Cir. 2012) ("Section 2611(4)(A)(ii)(I)'s inclusion of 'any person who acts, directly or indirectly, in the interest of an employer' plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's 'employer.'"); *Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002) ("It seems to us that the plain language of the statute decides this question."); *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) ("An individual may be held liable under the FMLA only if she is an 'employer. . . .'"); *see also* 29 C.F.R. § 825.104(d) ("As under the FLSA, individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA.").

[13] *See Haybarger*, 667 F.3d at 418-19 ("In analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, most courts look to the 'economic reality' of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee."); *Wascura v. Carver*, 169 F.3d 683, 686 (11th Cir. 1999) ("[D]ecisions interpreting the FLSA offer the best guidance for construing the term 'employer' as it is used in the FMLA."); *Modica v. Taylor*, 465 F.3d 174, 186 (5th Cir. 2006) (same). !

First, the FMLA's plain language applies to individuals because it defines "employers" to include "*any person* who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(I) (emphasis added); *see also* 29 C.F.R. § 825.104(d). This definition also "largely tracks" the FLSA's definition of "employer" under the FLSA, *Graziadio*, 817 F.3d at 422, under which we have permitted claims for individual liability, *see Hodgson*, 472 F.2d at 968. Consistent with other circuits, *see, e.g.*, *Darby*, 287 F.3d at 681, we conclude that the FMLA permits actions for individual liability.

Second, we likewise conclude the economic reality test applies due to the similarities between the FMLA and the FLSA. As mentioned, the FMLA and FLSA have largely parallel definitions of the term "employer," *Graziadio*, 817 F.3d at 422, and we apply the economic reality test under the FLSA to determine employer status, *Acosta*, 905 F.3d at 1160. Consistent with other circuits, *see, e.g.*, *Graziadio*, 817 F.3d at 422, we conclude that the economic reality test applies to determine whether an individual is an FMLA employer.

Because Ms. Walkingstick disputes only whether the economic reality test applies, not the magistrate judge's application of the test, we affirm summary judgment for Dr. Reif on this claim.[14]

---

[14] Ms. Walkingstick also argues the magistrate judge erroneously imposed the burden on her—as the summary judgment non-movant—to show that Dr. Reif was her employer. Aplt. Br. at 39. We disagree. Dr. Reif had the initial burden of showing "the absence of a genuine issue of material fact" regarding whether he was an FMLA employer, which he did "by pointing out to the court a lack of evidence on an essential element of [Ms. Walkingstick's] claim." *Savant Homes*, 809 F.3d

## III. **CONCLUSION**

We reverse the magistrate judge's grant of summary judgment on Ms. Walkingstick's Title VII sex and race discrimination claims and her Title VII retaliation claim. We affirm summary judgment in favor of Dr. Reif on her FMLA retaliation claim.

---

at 1137 (quotations omitted); *see* App., Vol. II at 225-27 (Dr. Reif's summary judgment motion showing he was not an FMLA employer); App., Vol. V at 1018 (district court order recounting Dr. Reif's showing). "[T]he burden then shift[ed] to [Ms. Walkingstick] to set forth specific facts" that Dr. Reif was an FMLA employer. *Savant Homes*, 809 F.3d at 1137; *see Celotex*, 477 U.S. at 324-25.